UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NAZIR HAMID,

        Plaintiff,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, et al.,

        Defendants.

Case No.  20-cv-01601-VC

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW GRANTING
PLAINTIFF'S MOTION FOR
JUDGMENT AND DENYING
DEFENDANTS' CROSS-MOTION
FOR JUDGMENT**

Re: Dkt. Nos. 30, 34

       Nazir Hamid brings this suit under the Employee Retirement Income Security Act based on Metropolitan Life Insurance's refusal to pay him short-term disability (STD) and long-term disability (LTD) income benefits under his employment benefits plan. Hamid applied for STD and LTD benefits based on chronic pain in his face and head that he says prevents him from working his job as a mortgage loan officer at Bank of America. His medical records reflect that his pain began in the early 2000s, that it became increasingly severe around 2016, and that it became debilitating in 2018, forcing him to stop working in October of that year. Hamid consulted various specialists, including otolaryngologists, neurologists, allergists, and rheumatologists. He received many rounds of allergy and Botox injections, tried a range of medications, and underwent multiple surgical procedures on his sinuses. At the time he stopped working, and in the months since then, his sinus CT scans, MRI scans, and blood tests have revealed only mild or no physical abnormalities. Despite this, Hamid continued to report debilitating face and head pain, and his doctors continued to credit these reports by

recommending and implementing new treatments.

MetLife denied Hamid's claims on the ground that there was "insufficient clinical evidence" to prove that he was "disabled" under the terms of the benefits plan. MetLife relied on the opinions of four "Independent Physician Consultants" who MetLife hired to evaluate Hamid's disability, all of whom concluded, based on a paper review of Hamid's files, that there was not enough "clinical" or "objective" evidence to substantiate Hamid's subjective complaints.

MetLife erred by denying Hamid benefits. First, MetLife improperly conditioned benefits on the existence of objective evidence, even against the backdrop of Hamid's consistent and corroborated reports of chronic pain. Second, MetLife misconstrued Hamid's lengthy medical history, failing to credit the numerous objective indicators of pain that did exist, and the unanimous opinions of Hamid's doctors that Hamid was disabled. Considering the totality of the evidence in the record, Hamid has met his burden to prove that persistent medical issues prevented him from performing his job at Bank of America, and that he is thus entitled to STD benefits and 24 months of LTD benefits.

# I

## A. Employment History & Benefits Plan

Hamid worked in the mortgage brokerage industry, and has worked as a mortgage broker both at his family's small firm and in larger institutions such as JP Morgan Chase. AR 6453-54. In 2014, he began working at Bank of America, and was there for almost two years before leaving to work at another bank. AR 5889. In January 2017, his previous manager at Bank of America hired him back to the company, and he continued to work there as an Enterprise Retail Sales Manager until October 2018. AR 6392. In that position, Hamid managed the mortgage department for eight Bank of America branches, with ten to fifteen employees reporting directly

to him. AR 6392. His responsibilities included providing leadership to his reports; recruiting, hiring, and training new employees; providing marketing direction and strategy; and monitoring and analyzing financial production success. AR 5639.

Hamid stopped working on October 1, 2018.  AR 6733. Hamid asserts that the "combination of frequent migraines, persistent pain and pressure in [his] face and head, along with side effects of medications that include fatigue and mental fogginess" prevented him from doing his job. AR 6394. Hamid further asserts that although his headache-related health issues began "somewhere around 2000," when he began "getting frequent, recurrent sinus infections with pain and face swelling," these issues became debilitating in 2018, and he ultimately "wasn't able to keep up any more at work." AR 6392-94.

At the time Hamid stopped working, he was a participant in the Bank of America Group Benefits Program ("the plan"), a health and welfare benefit plan providing short-term and long-term disability benefits. MetLife is the claims administrator for the plan.

The plan provides STD benefits for up to 26 weeks from the date of a claimant's disability. "Disabled" is defined for purposes of STD benefits as an "inability to perform the essential functions of your occupation, including working your regularly scheduled hours, for more than seven consecutive calendar days because of a pregnancy, illness, injury, organ donation, non-elective surgery or hospitalization. Whether an individual is 'disabled' and the date of disability is determined by MetLife and a treating health care provider." SPD 275.

The definition of "disabled" is different for purposes of LTD benefits. For these benefits, a claimant must show that "due to Sickness or as a direct result of accidental injury":

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment . . . and

- You are unable to earn in the first 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and
- after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

AR 7477.

### B. Medical Evidence

Hamid's medical history is extensive. His headache-related issues began in the early 2000s, when he started experiencing facial pressure in his forehead and cheeks, nasal congestion, post-nasal drip, and discolored nasal drainage. AR 5981. Since then, he has consulted over a dozen doctors, including otolaryngologists (ear, nose, and throat doctors), rheumatologists, neurologists, an allergist, an infectious disease consultant, and a pain consultant. He has consistently reported feeling chronic headaches and sinus pain, has been prescribed a host of different medications, and has undergone multiple surgical procedures.

One of the doctors Hamid sees most frequently is Safa Nsouli, an allergist who has treated Hamid since 2015. Hamid consistently reported to Dr. Nsouli suffering from a stuffy nose, sinus aches, headaches, pressure, and hoarseness, and Dr. Nsouli diagnosed Hamid with sinusitis, a deviated nasal septum, hypertophic turbinates, nasal polyposis, and polypoid changes. *See, e.g.*, AR 6132, 6136. Dr. Nsouli began administering allergy shots to Hamid in 2015, and has continued to administer these shots to Hamid every few weeks for the entire period for which medical records were provided. *See, e.g.*, AR 6069-6070, 6076-77.

In 2016, Hamid also consulted with otolaryngologists Lloyd Ford and Randall Wenokur. In April 2016, Dr. Ford suggested surgical intervention to address Hamid's years of chronic

sinus issues and to fix the physical abnormalities identified in the CT scans of Hamid's sinuses.[1] AR 6260. Hamid then sought a second opinion from Dr. Wenokur, who also noted "significant" physical abnormalities in Hamid's sinus CT scans. AR 6254, 6256. After discussing various treatment options, Hamid decided to first try a "pulmicort/saline rinse," but when these more "conservative measures" failed to alleviate the pain, Hamid elected surgery. AR 6256, 6265. On September 15, 2016, Dr. Wenokur performed five sinus procedures.[2] AR 6265. At his first post-operation check-up a few days after surgery, Hamid reported doing well. AR 6249. In subsequent visits, on October 6, October 27, and November 8, 2016, Hamid reported that his headaches and nasal obstruction had returned, that he did not feel relief from his long-term steroid use, and that he felt the surgery had not really helped. AR 6237-6246. The doctor's notes reflect that despite these symptoms, Hamid's "sinuses look[ed] good" except for some "mild" and "minimal" abnormalities. AR 6239. By November 2016, Hamid expressed interest in an additional surgery because he reported continuing to have "issues," despite the associated risks Dr. Ford told Hamid surgery would entail. AR 6239-6240.

In December 2016, Hamid consulted Dr. Sassan Falsafi, a different otolaryngologist who he had seen a few times before Dr. Wenokur's surgery. Dr. Falsafi noted that Hamid returned to see him because he felt Dr. Wenokur's surgeries "were not successful," and Hamid reported that he "continues to feel pressure in his forehead." AR 6354. Hamid further reported that his "true postop course experience was masked by Narcotics, so he cannot tell [] if he got any relief from surgery." AR 6354. Dr. Falsafi's treatment plan was to change Hamid's medication regime,

---

[1] The abnormalities included "bilateral sinus disease and concha bullosa," and "significant septal deviation and enlarged inferior turbinate." AR 6265.
[2] These included: bilateral endoscopic anterior ethmoidectomy, bilateral endoscopic maxillary antrostomics, bilateral endoscopic excision of middle turbinate concha bullosa, septoplasty, and inferior turbinate outfracture and coblation. AR 6265.

discontinuing some kinds and resuming others. AR 6354.

Hamid underwent another surgery in March of 2018 with Dr. Jayakar Nayak, an otolaryngologist at Stanford. Hamid first saw Dr. Nayak in 2010, and returned to him in November 2017 after the 2016 surgical procedure left him with "persistent [] facial pressure and pain that did not resolve," even after 4-5 courses of antibiotics and 1 course of prednisone. AR 5981. After additional rounds of medication did not successfully alleviate Hamid's symptoms— in February 2018, Hamid reported headache pain of "6/10 with intermittent 10/10"—and sinus CT scans showed persistent physical abnormalities, Dr. Nayak suggested surgery. AR 5940-42. On March 30, 2018, Dr. Nayak performed bilateral partial ethmoidectomies and office-based bilateral frontal and maxillary sinus balloon sinuplasty. AR 5951. Halfway through the latter procedure, Hamid experienced severe headache pain, which Dr. Nayak noted "could not be readily explained" as he had "never had a past patient experience this during or following in-office balloon sinuplasty." AR 5952. The pain Hamid reported caused Dr. Nayak to abandon his plans to perform a third planned procedure. AR 5953.

When Dr. Nayak followed up with Hamid in the following days, Hamid reported that the "throbbing pain was severe for several hours post-procedure (10/10)," but subsided later in the evening to "8/10 severity (both from time and pain medication)." AR 5953. About two weeks later, in mid-April 2018, Hamid returned to see Dr. Nayak. At the follow-up visit, Hamid reported "persistent headaches," as well as facial pressure (eyes and cheeks), nasal obstruction and discharge, and a lack of smell, despite continued use of saline rinses and medicated nasal sprays. AR 5971. Dr. Nayak noted that he "still cannot quite explain the nature of why the balloon office procedure led to so much pain and discomfort," because he had "performed between 50-75 of these procedures at Stanford, without an adverse event save bleeding." AR

5973. Dr. Nayak concluded that "the cause of the pain is still a mystery," and recommended interval sinus CT scans to track Hamid's progress, and a follow-up appointment in 2-3 months. AR 5973.

A few months later, in September 2016, Hamid went to see his primary care physician Dr. Dolores Musco to "help him figure out why he continues to have these problems." AR 6293. Dr. Musco noted that Hamid had a "multi-year history of sinus disease and headaches," which had involved "Allergy, ENT, and Neurology oversight." AR 6293. Hamid reported to Dr. Musco that the allergy shots had not worked, the ENT procedures had been ineffective, he hadn't been able to "tolerate" the neurologist's medication regimen, and he felt "taxed and restless from all the failed attempts to treat his issues." AR 6293. Hamid further reported that he continued to experience headaches, with the "current episode" starting months before, and the problem occurring "constantly." AR 6295. Dr. Musco's assessment of Hamid was that he suffered from "chronic nonintractable headache, unspecified headache type," "mixed hyperlipidemia," "other fatigue," "non-seasonal allergic rhinitis due to other allergic trigger," and "obstructive apnea." AR 6297. Dr. Musco noted that she had a "very long 90 minute conversation about how nothing is being done" on his sinuses, and recommended that he follow up with his neurologists and take one month off work "to sort this out w/ specialist." AR 6297.

Dr. Musco supported a leave of absence from work for Hamid starting on October 1, 2018. AR 6642. On October 16, Dr. Musco submitted an Attending Physician Statement in support of the medical absence and Hamid's STD claim, reporting diagnoses of "chronic headache" and "depression and anxiety," and listing symptoms of "chronic frontal daily headache, weekly migraines, [] anxiety, depression, [and] insomnia." AR 6681. Dr. Musco initially recommended that Hamid return to work on November 1, 2018; when asked to "list any

restrictions to work or activity," she stated "None, not sure if will be ready to go back to work on 11/1/2018." AR 6683. Dr. Musco saw Hamid at follow-up appointments in October, November, and December, at which points Hamid continued to report fatigue and sinus pain and an "inability to function w/ the chronic headaches." AR 6309; *see generally* AR 6298-6313. Dr. Musco repeatedly pushed back the date that she recommended Hamid return to work, and Hamid's medical leave of absence continued through at least March 25, 2020.[3] *See* AR 3692.

In addition to advising him to stop working, Dr. Musco also referred Hamid to various specialists. In particular, Dr. Musco noted that Hamid was "likely" suffering from "mixed headache," and thus referred him to neurology, which "deals with headache and chronic pain." AR 6300. Hamid first met with neurologist Chirag Patel on October 31, 2018. At that visit, Hamid reported daily headaches "occurring without warning, present to some degree all the time," that were "moderate to severe," with "nausea no vomiting, light and sound sensitivity," "some difficulty with concentration," and "general tiredness." AR 6224. Hamid further reported that these headaches had been occurring for over three months, sometimes for over four hours at a time, and that he had "tried and failed" numerous medications. AR 6228. Dr. Patel diagnosed Hamid with "chronic migraine without aura, intractable, without status migrainosus," while also noting that his "neurologic exam is overall unremarkable." AR 6227-28. As treatment, Dr. Patel authorized Botox injections for Hamid's "chronic migraine," and administered the first injection on December 7, 2018. AR 6178, 6228. Hamid reported that the Botox helped for a few days, but

---

[3] Sometime between July and August of 2019, Dr. Nsouli, Hamid's allergist, took over for Dr. Musco as the one authorizing Hamid's medical leave. *Compare* AR 5004 (Musco extending absence) *with* AR 5002 (Nsouli extending absence). In April 2019, Dr. Nsouli submitted his own Attending Physician Statement, listing diagnoses of "pansinusitis," "wheezing," and "asthma," symptoms of "severe headaches, fatigue, shortness of breath," and a treatment plan of "surgery, allergy immunotherapy weekly." AR 5628-29. When asked to note if he had advised Hamid about when he could return to work, Dr. Nsouli marked "No," and wrote: "Unknown we will see if any improvement with time if conditions will improve." AR 5630.

that the daily headaches then returned. AR 6178. Dr. Patel administered additional Botox injections on March 1 and May 30, 2019. AR 4665. Dr. Patel also ordered an MRI, which was performed on December 31, 2018 and revealed "no acute intracranial abnormalities." AR 6182.

In October 2018, Hamid also saw Dr. Haramandeep Singh—another neurologist—for a polysomnogram sleep study. Hamid had seen Dr. Singh once before in 2011, at which point Dr. Singh diagnosed Hamid with mild obstructive sleep apnea, and recommended that he wear an auto-CPAP mask while sleeping. AR 6360. Hamid later reported that the CPAP did not help him. AR 6350. The 2018 polysomnogram report revealed a "normal sleep efficiency" without any "significant obstructive sleep apnea syndrome." AR 6368. Dr. Singh diagnosed Hamid with "sleep apnea, unspecified." AR 6368.

Dr. Musco also referred Hamid to doctors Sheena Ogando and Raul Romea, specialists in rheumatology. Over the course of visits in October, December, and January, Hamid reported headaches, "neck pain/stiffness," "chronic fatigue," "brain fog," and joint stiffness. AR 6319-6328. In October, Hamid stated his symptoms had "been present for several months" and had "worsened" after his March 2018 surgery. AR 6319. The rheumatologists conducted multiple lab tests and joint tests, which were "unremarkable" and revealed "[n]o advanced degenerative change or acute findings." AR 6334, 6336. The doctors suggested various changes to Hamid's prescription regimen; in January, Hamid reported things were "so far the same." AR 6238.

In November 2018, Hamid returned to Dr. Nayak for a six-month follow-up visit after the March surgery. At the November consult, Hamid reported "worsening/persistent headaches, occasional neck stiffness, fatigue, facial pain, pain level increases to 8/10, intermittent nasal discharge, nasal congestion, nasal obstruction, decreased sense of smell[,] [m]ild nasal burning, nasal dryness, [and] intermittent sense of suffocation that has been reduced via allergy shots

intermittently." AR 5982. Dr. Nayak noted that he had a "lengthy discussion" with Hamid about these symptoms, but that "with every measure that I have at my disposal, [his] symptoms are far out of proportion to his exam and objective findings," and "all of my office-based interventions, and topical medications, have provided only limited to minimal, short lived benefit." AR 5984-85. Dr. Nayak concluded that Hamid's "persistent facial pain and migraine headaches [] are likely unrelated to sinuses given essentially clear paranasal sinuses on his most recent CT scan," and that instead the "neurological migraine history and allergies may be the major players for him at this time." AR 5985. Dr. Nayak thus recommended that Hamid place the "nasal/sinus" question "on the back burner for now," and pursue neurology-, allergy-, and Botox-related treatments for his pain. AR 5985.

Five days after this visit, Dr. Nayak conducted a multi-hour review comparing Hamid's CT scan images from before his 2016 procedure to the ones taken in November 2018. Based on this analysis of the two CT scans, Dr. Nayak noted three "possible sources[s] of [Hamid's] persistent unexplained" headaches, that in "rare" circumstances could cause pain: (a) increased contact between Hamid's nasal septum and concha; (b) bilateral superior turbinate concha bullosae contact with the nasal septum; and (c) persistent left front-ethmoid air cells in contact with the septum and with mild surrounding rims of opacification. AR 5985-89.

In December 2018, Hamid visited a different otolaryngologist—Dr. Karen Fong. Dr. Fong had seen Hamid in 2015, but had not evaluated him since then. At the 2018 appointment, Hamid reported symptoms of face pressure, nasal congestion, post-nasal drip, nasal drainage, and "constant . . . pressure/pain with burning sensation." AR 6341. Hamid further stated that his previous medication treatments (including nasal sprays/rinses, steroids, antibiotic therapies, prednisone courses, etc.) and current sinus medication regime provided "minimal relief." AR

6341. Dr. Fong conducted an endoscopy and reviewed Hamid's November 2018 CT scans, stating that "none of those findings appear to correlate with his significant nasal and [headache] symptoms." AR 6347. Dr. Fong advised Hamid to continue with his allergy and migraine management, and follow up with his other treating physicians, especially Dr. Nayak. AR 6347.

Hamid returned to see Dr. Nayak in February and July of 2019. At the July visit, Hamid reported that he continued to experience "facial pain," "frontal and eye pain, [an inability] to breath [sic] through nose, fatigue, nasal discharge, nasal congestion, [and] decreased sense of smell." AR 4657. Hamid further reported that his medication provided him "relief for [a] couple of hours and then the symptoms return." AR 4657. Dr. Nayak treated Hamid with a steroid injection in Hamid's sinuses. AR 4658. Dr. Nayak's "plan" for future treatment noted possible additional future sinus injections, and a sinus surgery in September/October 2019. AR 4658.

In the first half of 2019, Hamid also consulted two new specialists. First, he met with Dr. Bakul Roy, an infectious disease expert. Dr. Roy conducted a range of blood tests and immunodeficiency tests, all of which showed normal results. *See* AR 4692. Second, Hamid met with Dr. Richard Shinaman, a pain consultant. Dr. Shinaman noted that Hamid reported "moderate to severe" pain that is "chronic in nature" and present "much of the time." AR 4699. Dr. Shinaman also noted that Hamid seemed "very educated about the evolution of chronic pain syndrome," and expressed a desire "to pursue more comprehensive multidisciplinary pain relieving treatments in an effort to decrease overall pain and human suffering." AR 4700. Dr. Shinaman and Hamid discussed a range of possible pain care management techniques, including opioids, blocks, medication infusion trials, non-medication alternatives, and lifestyle changes; Dr. Shinaman stated that Hamid "seems reluctant to do much besides take the medication at this point due to reporting a 'fear of complications.'" AR 4704-05.

In the latter half of 2019, Hamid returned to Dr. Nayak. Hamid's CT sinus scans, EKG stress tests, and other lab reports all returned normal, despite Hamid continuing to report nasal pain and headaches. AR 4049-4060. Dr. Nayak recommended additional sinus surgery, which Hamid said he would consider. AR 4060.

Hamid also continued to see Dr. Patel (in neurology) during the latter half of 2019. By August, Hamid had already received three Botox injection treatments, and while he reported "some relief," Hamid was not sure whether it was caused by the Botox or the Percocet he had recently started taking. AR 4067. Hamid also continued to report headache symptoms, including "nausea no vomiting, light and sound sensitivity." AR 4067. Dr. Patel continued to diagnose him with "chronic migraine without aura, intractable, without status migrainosus," and noted that his "neurologic exam" and MRI results were still "unremarkable." AR 4072. Dr. Patel recommended considering other treatments besides Botox, given that Hamid was unsure if the injections were helping, but Hamid stated he wanted to try one more time, in part because he was considering sinus surgery and didn't want to "cloud the picture" with other new medications. AR 4072.

Hamid had his third sinus surgery—involving 9 different procedures—with Dr. Nayak on December 26, 2019.[4] Dr. Nayak described the "goal" of this surgery as "provid[ing] normal sinus anatomy/drainage pathways and nasal breathing to either improve facial pain or further understand etiology of facial pain." AR 355. Immediately after the procedure, Hamid reported "uncontrolled left frontal pain"—pain he described as "10/10" and "disabling"—that was not alleviated by either hydromorphone or fentanyl. AR 346. The doctors decided to keep him in the

---

[4] The procedures included (1) bilateral maxillary antrostomies with tissue removal; (2) bilateral total ethmoidectomies; (3) bilateral sphenoidotomies with tissue removal; (4) bilateral frontal sinusotomies; (5) endoscopic septoplasty; (6) bilateral inferior turbinate submucosal reductions; (7) bilateral lysis of intranasal synechiae; (8) bilateral resection concha bullosae; (9) computer-assisted, intraoperative, extradural navigation. AR 354.

hospital for observation, gave him an overnight ketamine infusion, and prescribed opioids, which Hamid said did not help his headache and had "side effects of fogginess" and "tiredness." AR 346. By the next day, Hamid's vital signs were stable and the ketamine infusion was stopped; he was discharged "with no pending issues or concerns." AR 348. At his post-operation visit a few days later, Hamid was noted to be "doing well post operatively" but "still dealing with facial pain component." AR 421. Hamid was prescribed medication and rinses, including Percocet, and was referred to a chronic pain clinic "regarding intranasal ketamine as a long-term option." AR 421. The last medical reports included in the record are from this January 2020 post-operation visit.

### C. Social Security Administration Determination

In August 2019, the Social Security Administration ("SSA") approved Hamid's request for Social Security Disability Insurance based on the alleged disability of "migraines" and more or less the same medical records Hamid submitted to MetLife in support of his claims for STD and LTD benefits. *See* AR 3670. There is no reasoned decision by an Administrative Law Judge explaining the SSA grant; the entirety of the decision is contained in a one-page report from an SSA medical consultant. The medical consultant found that the evidence showed that Hamid suffered from "daily moderate to severe [headaches], associated with fatigue, nausea, photophobia [light sensitivity] and phonophobia [sound sensitivity]"; that Hamid had undergone various treatments over the years with "minimal improvements in symptoms"; and that Hamid was "[u]nable to function when having [headache] episodes." AR 3670. The medical consultant described Hamid's impairment as "[m]igraines occurring at least once weekly despite adherence to treatment for at least three months," with "significant interference with activity during the day." AR 3670.

### D. Claims Process

Hamid submitted a claim for STD benefits in October 2018 based solely on Dr. Musco's October 2018 medical records diagnosing Hamid with "chronic headache" and "depression and anxiety." AR 6681. After the STD claim was denied in late October, Hamid, then proceeding with counsel, appealed the STD claim decision and submitted a claim for LTD benefits. AR 6424. On his LTD application, Hamid listed his conditions as "severe migraines that cause extreme fogginess, difficulty concentrating, memory loss, allergies that cause flaring & swelling of face, [and] sinus pain." AR 6440. MetLife denied the LTD claim, and Hamid appealed. AR 4952, 5578.

Dr. John Del Valle, MetLife's medical director, was the first doctor employed by MetLife to reject Hamid's disability claim.[5] He concluded there was "insufficient evidence substantiating the presence of a condition that would have physically precluded [Hamid's] work capacity during the period in question." AR 5842. Dr. Del Valle "noted and appreciated" Hamid's "symptoms and claims of disability," but opined that "the reported symptoms are subjective with no clear evidence to substantiate a severity that would have hindered [Hamid's] work capacity during the period in question." AR 5842.

To further assist it in evaluating Hamid's claims, MetLife also hired numerous "Independent Physician Consultants," all of whom conducted a paper review of Hamid's medical records and also concluded that Hamid failed to qualify as "disabled." David Burke and Hootan Zandifar, a neurologist and otolaryngologist, respectively, were two of the primary consultants. Dr. Burke opined that Hamid's headaches "are not debilitating resulting in functional

---

[5] Dr. Del Valle incorrectly used the female pronoun when describing Hamid, which may be partly because some of Dr. Musco's records also incorrectly used female pronouns. *See, e.g.*, AR 6295.

impairment," as "[f]atigue is a very generalized subjective term with no corresponding clinical deficit" and "there is no neurological abnormality to limit the claimant's functioning." AR 5590. Dr. Burke further stated that Hamid's "fatigue and concentration symptoms are subjective with no established physical or cognitive deficit." AR 5591. Dr. Burke reiterated these initial conclusions in three subsequent addendum reports, each conducted after Hamid submitted updated medical records, stating, for example, that "there is no single clinical abnormality to concur with [Hamid's] symptoms and reported difficulties"; that "[r]eports of those around the claimant support a subjective burden but lack the clinical documentation to support actual restriction"; that "there is no documented indicators of disease severity to preclude activity status"; and that "[s]ymptoms appear out of proportion and [are] conflicting with the work-up and clinical findings." AR 86, 3937, 3943.

Dr. Zandifar evaluated Hamid's records from an otolaryngology perspective. He opined that Hamid "has subjective symptoms with no clear evidence to substantiate a severity that would have hindered work capacity," and that Hamid's "examination findings were not significant." AR 73-74. Dr. Zandifar further concluded that Hamid's "extensive symptoms ha[ve] no basis from an [ear, nose, throat] related etiology/condition." AR 75. Like Dr. Burke, Dr. Zandifar reiterated these opinions in subsequent addendum reports prepared in response to new records submitted by Hamid, stating, for example, that although Hamid reports symptoms "that subjectively renders him unable to work, I am unable to find support for a physically impairing condition" based on the normal CT scans and lab tests. AR 93.

MetLife also solicited an opinion from Dr. Leonard Sonne, a pulmonologist. Dr. Sonne stated that "there is no objective documentation of any internal medicine restriction, limitation, or impairment," and observed that Hamid was "able to attend multiple provider office visits and

give a detailed medical history." AR 5458. Dr. Sonne echoed these same sentiments in two subsequent reports, again concluding that Hamid had no "objective documentation" of internal medicine or pulmonology impairments, as his "examinations" and EKG/stress tests were clear and normal. AR 3948; *see also* AR 5056.

Finally, MetLife hired Dr. Rafid Fadul, who specializes in internal medicine and pulmonology, to review Hamid's file.[6] Dr. Fadul concluded that the "medical information does not support any evidence" of physical limitations, as Hamid's recent physical sinus examinations were "benign," "there were no significant sinus abnormalities," and his sporadic follow-ups with Dr. Nayak "indicat[ed] that frequent treatment is not required." AR 43-44. Dr. Fadul reiterated these conclusions in addendum reports submitted after reviewing Hamid's January 2020 medical records, noting that "there is no documented pulmonary/[internal medicine] associated impairment," and that Hamid's labs and X-rays were "normal." AR 45-46.[7]

Hamid informed MetLife of the SSA's decision and sent it the full SSA file in mid-November 2019. AR 3669. About one month later, and after Hamid's lawyer inquired about the status of his claims appeals, an internal MetLife email noted the need for additional review of Hamid's records, stating they "cannot just ignore the SSA medical file." AR 1249, 1256. MetLife's consultants then reviewed Hamid's SSA file; none changed their earlier

---

[6] Dr. Fadul reported talking to Dr. Musco, Hamid's primary care physician, on December 23, 2019. According to Dr. Fadul, Dr. Musco stated that Hamid had "no restrictions and limitations from her standpoint." AR 44. This report prompted Hamid to submit a declaration to MetLife stating that his last appointment with Dr. Musco was in July 2019, and that he was no longer under her care. AR 60. Hamid further stated that at "most" of his appointments with Dr. Musco he would meet with a nurse practitioner instead of with Dr. Musco herself, and that he and Dr. Musco had developed personal conflicts after Hamid tried to find a different primary care doctor. AR 60.

[7] In addition, MetLife asked a psychologist, Dr. Sarah Sicher, to review Hamid's medical records. She concluded that Hamid's medical history did not support psychiatric functional impairment. AR 3949-3952.

determinations that Hamid did not qualify as "disabled" based on these reviews. *See, e.g.*, AR 86-90.

In addition to the SSA decision and the medical records summarized above, Hamid submitted other evidence as part of the claims appeals process. First, some of Hamid's treating physicians wrote letters in support of his claims. Dr. Nsouli, Hamid's allergist, submitted two letters, one in March 2019 and one in August 2019. In the first letter, Dr. Nsouli described the weekly allergy immunotherapy injections he administered to Hamid and Hamid's compliance with these ongoing treatments. AR 6402-04. Dr. Nsouli stated that Hamid's "only goal was to get better in order to be able to work" and that there was no reason to believe Hamid was "magnifying the extent of his symptoms." AR 6404. Dr. Nsouli also asserted that it would be "difficult" for Hamid to return to work because of "all the symptoms described" and "all [the] treatments necessary[,] including many side effects of some prescribed pharmacological agents." AR 6404. In the second letter, Dr. Nsouli noted that Hamid had agreed to receive a "rush dose" of allergy immunotherapy to try and accelerate his treatment, and that this caused "serious local and systemic anaphylactic reactions." AR 4976. Hamid submitted photos showing the rash's spread across his face, neck, chest, arms, and back. AR 4968-4972. In the second letter, Dr. Nsouli also reiterated that Hamid is a "compliant patient" whose "only goal is to get better." AR 4976.

Dr. Nayak also wrote a letter in support of Hamid's appeals. AR 5884. Dr. Nayak stated that "[d]espite [surgical] interventions, and numerous medical therapies, such as rinses, sprays, and Neurology consults, [Hamid] continues to suffer from unexplained and debilitating facial pain and headaches." AR 5886. Dr. Nayak also stated that Hamid's "symptoms remain far out of proportion to his exam and imaging," but that Hamid is "unable to work on a full-time basis with

his current symptoms and need for frequent medical appointments." AR 5886-87. Dr. Nayak

concluded: "I have no reason to believe that Mr. Hamid is magnifying the extent of his

symptoms for secondary gain. He is precisely the type of patient who would benefit from short

disability to alleviate the burden to his wife and family at this challenging time." AR 5887.

Dr. Romea, Hamid's rheumatologist, was the last doctor to write a letter in support. In his

letter, Dr. Romea wrote: "I do not think [Hamid] is a malingerer, and his impairments, being

highly subjective, naturally could not be quantified on an exam. In short, THE ABSENCE OF

PHYSICAL FINDINGS CANNOT BE USED AS EVIDENCE THAT HE IS NOT DISABLED

FROM HIS USUAL OCCUPATION." AR 5635 (emphasis in original).

Hamid also hired Dr. Robert Weinmann to conduct an "Independent Medical Evaluation"

in March 2019 to support his claims. Dr. Weinmann evaluated Hamid in person, at which time

Hamid reported that "his main debilitating symptom . . . is headache . . . always present albeit

variable in intensity," and that headaches and "sinus pressure" are "constant, i.e., present over

90% of the time." AR 6375. Hamid also reported that his symptoms are "relieved best by

percocet but only on a short-term basis," and are relieved to a lesser degree by other opioids. AR

6375. Dr. Weinmann reviewed Hamid's medical records from recent years and opined that the

"evidence in this case favors a combined headache syndrome with Rhinogenic or Sinus

Headache [] and Chronic Migraine [] as chief causative factors of disability." AR 6377. Dr.

Weinmann further stated that Hamid "can't be depended on for normal work hours because of

overriding pain and headache that is often not predictable," and that Hamid's "subjective

complaints are credible and in line with the objective findings." AR 6377. Dr. Weinmann

concluded that Hamid "should continue current treatment protocol with Drs. Nayak and Patel.

He is not ready to return to his usual and customary job or for trial employment. He meets the

criteria for disability classification." AR 6378.

Hamid also submitted declarations from family members and co-workers, including from his wife, siblings (both of whom had worked with Hamid), cousin, sister-in-law, former co-worker at Chase bank, and manager at Bank of America. AR 6380, 6382, 6385, 6388, 5888, 4757, 4909. All relayed the same basic message: that Hamid was an active, energetic, and hard-working man before his headaches became severe; that the change in his personality and habits after he began experiencing more pain was noticeable; and that he would be working again if he could.

Finally, Hamid himself submitted multiple declarations describing his headache symptoms and the unsuccessful attempts to improve these symptoms through medications, treatments, and surgeries, along with photos of his swollen face and eyes. AR 4962-4972, 6392-6395. Hamid declared that his health issues "have not only made it impossible for me to work a regular full-time schedule at my job, but have also interfered with my ability [to] participate in normal life activities," such as playing with his children and going to the gym. AR 6394-95.

In February 2020, MetLife informed Hamid that it was upholding the denials of STD and LTD benefits based on its conclusion that Hamid did not suffer a "disability" within the meaning of either claim. AR 19-22, 26-33. MetLife asserted, with respect to both claims, that, "[a]s detailed above by four [Independent Physician Consultants], there is insufficient clinical evidence to support physical or psychology functional restrictions and limitations preventing work as of October 1, 2018." AR 21, 32.[8]

**II**

---

[8] MetLife's appeals decisions rely only on the opinions of four of the consultants it hired: Drs. Zandifar, Burke, Fadul, and Sicher.

**A. Standard of Review**

The default standard of review by which a court reviews a denial of ERISA benefits is de novo. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011). Throughout this litigation, with one fleeting exception noted below, the parties have agreed that de novo review applies to both the denial of STD and LTD benefits. *See* Dkt. No. 22. "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Construction Management, Inc.*, 623 F.3d 1290, 1296 (9th Cir. 2010). Hamid, as the claimant, bears the burden of showing that he is disabled. *See id.* at 1294.

A footnote in MetLife's initial brief tepidly suggests, for the first time, that the denial of STD benefits be reviewed only for abuse of discretion. MetLife made no further mention of this, either in its second brief or at the hearing. It has thus waived any argument that abuse of discretion review applies. *See Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017). And in any event, MetLife's denial of STD benefits would constitute an abuse of discretion for the same reasons that it fails de novo review: MetLife rejected Hamid's consistent reports of pain, corroborated and credited by his treating physicians, based on the opinion of hired consultants—who never met Hamid in person—that insufficient objective evidence substantiated his pain, and without grappling with the contrary conclusion reached by the Social Security Administration on the same medical record. *See Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 905-06 (9th Cir. 2016); *Salomaa*, 642 F.3d at 676; *Montour v. Hartford Life & Accident Insurance Co.*, 588 F.3d 623, 634-36 (9th Cir. 2009).

**B. Benefits Decisions**

This case turns on whether Hamid can show that the subjective symptoms he claims to suffer rise to the level of a "disability" within the meaning of the plan. The consultants whose reports MetLife relied upon to deny Hamid benefits all concluded that Hamid was not "disabled" because there was a lack of "objective," "clinical" and "exam" findings that sufficiently reflected the pain Hamid reported experiencing. MetLife emphasized these opinions in its letters upholding the denial of STD and LTD benefits, asserting that there was "insufficient clinical evidence to support physical" disability. AR 21, 32.

In the context of Hamid's prolonged and consistently documented reports of chronic pain and headache symptoms, MetLife was wrong to insist on "objective" and "clinical" evidence as a prerequisite for disability benefits. In some cases, "'the lack of objective physical findings' is insufficient to justify denial of disability benefits." *Nagy v. Group Long Term Disability Plan*, 183 F. Supp. 3d 1015, 1028 (N.D. Cal. 2016) (quoting *Salomaa*, 642 F.3d at 669). This is because "[m]any medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established," meaning that a company cannot "condition coverage on proof by objective indicators." *Salomaa*, 642 F.3d at 678; *see also Montour*, 588 F.3d at 635. Chronic headache and migraine pain of the kind Hamid reports is precisely the kind of medical condition that is difficult to quantify through lab reports and imaging scans. *See Holmgren v. Sun Life & Health Insurance Co.*, 354 F. Supp. 3d 1018, 1028 (N.D. Cal. 2018) (citing *Cruz-Baca v. Edison International Long Term Disability Plan*, 708 F. App'x 313, 315 (9th Cir. 2017) ("Pain is an inherently subjective condition.")). Yet MetLife (and its consultants) hinged the disability determination on the lack of these "objective" tests—they focused exclusively on the "normal" readings of Hamid's CT scans, blood tests, and MRIs, and "essentially disregarded [his] complains of severe pain, which . . . have persisted over an

extended period of time." *Shaikh v. Aetna Life Insurance Co.*, 445 F. Supp. 3d 1, 5 (N.D. Cal. 2020).

Now that they are in litigation, the defendants admit that ailments such as migraines are difficult to prove via "objective" evidence. They argue instead that Hamid does not actually suffer from migraines. They say he suffers from sinus and allergy issues (which are more readily quantified by objective tests), and that he only started invoking the term "migraine" in October 2018—after he submitted his benefits claims and hired a lawyer—in a strategic attempt to make his disability claims more compelling. But that is false. The record shows that Hamid used the term "migraine" and was diagnosed with "migraines" before submitting his STD claim in October 2018. Dr. Falsafi's notes from a May 2016 visit state that Hamid has a past medical history of "migraine headaches." Dr. Musco's notes from a September 2018 visit reflect a diagnosis of "chronic mixed headache syndrome," which is a combination of migraines and muscle contractions. And Dr. Patel's notes from an October 2018 visit state that Hamid had previously been diagnosed by a doctor at Stanford with "intractable chronic migraine" and had tried "several medications" as treatment. AR 4477, 4549, 6203.

Moreover, Hamid's medical history does not reflect a calculated shift from describing symptoms as "headaches" to describing them as "migraines" in an attempt to game the system; rather, it reflects a years-long and frustrating attempt to figure out the causes of and possible solutions to his incessant discomfort. Hamid consistently reported experiencing moderate to severe pain and pressure in his face and head. Given his lack of medical training and experience, it is unsurprising that the exact terminology he used to describe this pain varied over time, especially as the diagnoses he was given by his doctors also varied over time. For example, Dr. Nayak, an experienced otolaryngologist at Stanford, opined in February 2018 that Hamid's

"sinuses (and not a neurogenic issue or migraines)" were the main cause of his headaches. AR 5943. After the sinus procedure that Dr. Nayak performed in March of that year failed to provide Hamid long-term relief—and in fact exacerbated Hamid's reported pain—Dr. Nayak changed his diagnosis and opined in November 2018 that Hamid's headaches "are likely unrelated to sinuses" and "that instead his neurological migraine history and allergies may be the major players for him." AR 5985. If Hamid's doctors had this sort of evolving understanding of the cause of Hamid's pain based on the varying success of attempted treatments, Hamid himself can hardly be faulted for describing his pain in a similarly evolving way.

Presumably MetLife is now flailing about to find credibility problems with Hamid because it knows that its medical consultants were wrong to assume, simply from the absence of clinical evidence, that Hamid was exaggerating his symptoms. But not a single one of Hamid's many treating doctors ever hinted that they thought Hamid was fabricating his pain; to the contrary, his doctors continued to credit his reported symptoms by recommending and implementing new treatment options, including relatively drastic ones such as surgery and opioids. Drs. Nsouli, Nayak, and Romea also each wrote letters to MetLife in support of Hamid's claims emphasizing their belief that Hamid was not inventing or exaggerating his symptoms. *See* AR 5635, 5886-87, 6402. Hamid's family members and co-workers, including his manager at Bank of America, similarly submitted declarations corroborating Hamid's reports of pain. It is true that Hamid's medical tests came back mostly normal, with CT scans of his sinuses showing only mild abnormalities, and his blood and MRI tests revealing no detectable issues. As Dr. Nayak put it, Hamid's symptoms were "far out of proportion to his exam and objective findings." AR 5985. But even with this assessment, Dr. Nayak never questioned the veracity of Hamid's reported pain. In fact, he continued recommending different treatments, including an

additional surgical procedure, and continued to pursue the "goal" of "further understand[ing] [the] etiology of [Hamid's] facial pain." AR 355. There is thus nothing in the record to suggest that Hamid was lying about his symptoms, and significant evidence to suggest that he was not. *See Demer*, 835 F.3d at 905.

Indeed, MetLife's consultants—the only people to question whether Hamid's reported symptoms were real—were also the only people to not evaluate him in person. They merely conducted a paper review of his medical records. In ERISA cases, the opinions of treating physicians are not entitled to special deference, but as compared to physicians who conduct only paper reviews, treating physicians are far better positioned to assess a claimant's credibility, and "one would expect any doubts as to whether [Hamid] in fact suffered the pain he alleged . . . would be reflected in the medical records." *Shaikh*, 445 F. Supp. 3d at 6. The fact that Hamid's treating physicians uniformly concluded he was credible and disabled is thus strong evidence in his favor, even against the uniform conclusions of MetLife's consultants that he was not. *See Salomaa*, 642 F.3d at 676; *Lavino v. Metropolitan Life Insurance Co.*, 779 F. Supp. 2d 1095, 1112-13 (C.D. Cal. 2011).

Moreover, there are indeed objective indications that Hamid was disabled beyond just his self-reported symptoms. Most saliently, his medical records show that in the months before and after he stopped working he pursued a full-fledged, multi-faceted attempt to alleviate his pain through a range of treatment options, including evaluation by a pain management consultant and a variety of specialists in the fields of neurology, otolaryngology, rheumatology, and infectious disease; receiving Botox injections and an accelerated round of allergy injections (the latter of which caused severe allergic reactions); and undergoing two surgical sinus procedures (in March 2018 and December 2019), both of which caused extreme pain and discomfort. This itself is

objective evidence of Hamid's disability. *Cf. Montour*, 588 F.3d at 635 (holding medical records suggesting claimant "had not recently engaged in any pain treatment programs" constituted "objective" evidence supporting denial of benefits); *see also Holmgren*, 354 F. Supp. 3d at 1029 (finding it telling that "plaintiff sought treatment for his pain at least as early as 2008 and continued to seek a firm diagnosis and treatment throughout his disability application and appeal, including three invasive surgical operations"). In addition, Hamid was prescribed numerous powerful drugs, including various opioids and ketamine, which also constitutes objective evidence of Hamid's impairment. *Cf. Montour*, 588 F.3d at 635 (holding pharmacy records indicating claimant was using "limited and relatively mild pain medication" constituted "objective" evidence supporting claim administrator's determination that claimant was not disabled); *see also Demer*, 835 F.3d at 905.

It is also notable that the SSA granted Hamid Social Security Disability Insurance on essentially the same medical record, and separately notable that MetLife did not engage with this decision in any meaningful way. In the ERISA context, Social Security disability awards "do not bind plan administrators" and merely constitute "evidence" of disability. *Salomaa*, 642 F.3d at 679. But "[o]rdinarily, a proper acknowledgement of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." *Montour*, 588 F.3d at 636. A failure to "grapple with the SSA's contrary disability determination"—such as by "articulat[ing] why the SSA might have reached a different conclusion"—thus "raises questions about whether an adverse benefits determination was 'the product of a principled and deliberate reasoning process.'" *Id.* at 635 (quoting *Glenn v. Metropolitan Life Insurance Co.*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd* 554 U.S. 105 (2008)). MetLife's cursory treatment of the SSA decision in Hamid's case thus

further undermines its finding of no disability. In its letters upholding the denial of benefits, MetLife briefly acknowledges the SSA decision, stating that it is "based on different standards than the Plan," and then asserts that its "review, that included four Board Certified [Independent Physician Consultants], who review the clinical evidence provided[,] found there was insufficient clinical findings to support" disability. AR 21, 31. This purported explanation offers nothing of substance. First, as discussed, the assertion that the record lacked "clinical evidence" was both an improper ground for denying benefits and simply not true. Moreover, the MetLife consultants' review of Hamid's SSA file seemed to be little more than a check-the-box afterthought. Nearly a month after Hamid submitted the SSA file, and after Hamid's lawyer inquired about the status of his prolonged benefits appeal, MetLife (rightly) noted that it could not "just ignore" the SSA file, and asked its consultants to look at it—their reports merely state that they "reviewed" the SSA file and that it contained no new information that changed their previous findings of no disability. AR 86-87, 88-89, 1249, 1256. No further analysis or comparison was offered.

Considering the totality of the evidence in the record—including Hamid's consistent reports of chronic head and face pain, corroborated by his family members and co-workers; the numerous treatment options he pursued, including consulting specialist doctors in at least four different fields, receiving repeated Botox and allergy injections, and electing to undergo multiple surgical interventions; the uniform conclusion of his treating physicians that his reports of symptoms were credible; and the grant of Social Security Disability Insurance on essentially the same medical record—Hamid has met his burden to show that he was unable to perform his job as an Enterprise Sales Manager at Bank of America.

**III**

Hamid's motion for judgment is granted, and MetLife's cross-motion for judgment is denied. The record shows that Hamid's medical issues prevented him from working at his job as of October 1, 2018. MetLife is thus ordered to pay Hamid STD benefits and the first 24 months of LTD benefits as provided for in the plan. Because MetLife has not yet considered a claim for LTD benefits beyond the first 24 months (which involves an assessment of whether Hamid's disability prevents him from working in "any gainful occupation" rather than just his own occupation), the Court expresses no opinion on that issue. A separate judgment will be entered in Hamid's favor, and any motion for costs and attorneys' fees is due within 14 days of entry of that judgment.

   **IT IS SO ORDERED.**

Dated: February 5, 2021

VINCE CHHABRIA
United States District Judge